IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| TERRY WESLEY GUEST, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 3:04cv00290 SWW |
| | * | |
| CRAIGHEAD COUNTY SHERIFF'S | * | |
| DEPARTMENT; JACK McCANN, | * | |
| Sheriff of Craighead County; CITY OF | * | |
| BROOKLAND, a municipality; | * | |
| BROOKLAND POLICE DEPARTMENT; | * | |
| MARK RUSSER, Chief of Police of | * | |
| Brookland; AARON MURPHY, individually | * | |
| and in his official capacity as a police officer | * | |
| for the Brookland Police Department; | * | |
| DEPUTY BASSHAM, DEPUTY JOHNSON, | * | |
| DEPUTY RICHARDSON, individually and | * | |
| in their official capacities as deputies for the | * | |
| Craighead County Sheriff's Department in | * | |
| Jonesboro, Arkansas, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

This is a 42 U.S.C. § 1983 action in which the plaintiff, Terry Guest, alleges excessive force, unreasonable seizure, unlawful arrest, failure to protect, assault, and battery in the course of his arrest on September 17, 2002. Trial is scheduled for July 25, 2005. The following motions are before the Court: (1) motion of separate City defendants, City of Brookland, Mark Rusher,[1] Chief of Police of the City of Brookland, and Aaron Murphy, a police officer for the City of Brookland Police Department, for summary judgment (the "City defendants") [doc.#21];

---

[1] Erroneously named by plaintiff in the complaint as Mark Russer.

and (2) motion of separate County defendants, Jack McCann, Sheriff of Craighead County, and Craighead County Sheriff Deputies Jared Bassham, Ron Richardson, and Leon Johnson for summary judgment (the "County defendants") [doc.#25].[2] The plaintiff has responded in opposition to both of these motions, and the City and County defendants have each filed a reply to plaintiff's response. Having considered the matter, the Court finds that the City defendants' motion for summary judgment should be and hereby is granted in its entirety, and that the County defendants' motion for summary judgment should be and hereby is granted in part and denied in part.

I.

On September 17, 2002, Officer Aaron Murphy of the City of Brookland Police Department went to plaintiff's ex-wife's house where plaintiff was located to serve what was titled a warrant of arrest on plaintiff from the City of Hoxie for fictitious tags and failure to appear. City Def.'s Ex. 1. It was Murphy's belief that he was there to arrest plaintiff – to take him into custody – as "[t]hat's what the warrant had read," Murphy Depo. at 39, although according to Terry Sutton, then-Chief of Police for the City of Brookland, Murphy was being asked to "[j]ust serve the warrants ... just to appear in court, to give him a court date." Sutton Depo.

Upon arriving at the residence, Murphy knocked on the door, which plaintiff opened. Upon seeing that it was Officer Murphy, and knowing that Murphy had seen him, plaintiff shut

---

[2] The two other named parties, Craighead County Sheriff's Department and Brookland Police Department, were dismissed by Order filed October 25, 2004 [doc.#13]. Thus, all remaining parties are now moving for summary judgment.

2

the door "on him" and did not open it "for a few minutes." Guest Depo. at 28-29.[3] When plaintiff finally opened the door, Murphy said he needed to speak to plaintiff outside. Plaintiff did not want to step outside because he did not feel well and it was hot outside. Guest had had sixteen teeth removed earlier that day, having spent five hours in the dentist's office, and "really, really felt terrible. Sick at my stomach and hurt." Guest Depo. at 29. Plaintiff noted that his teeth were bleeding at this time and that he had to "change the gauze ever so often or blood gets to running down your throat." Guest Depo. at 30-31. Murphy, who apparently at that time had determined not to take plaintiff into custody but just give him a court date pursuant to the warrant he was then serving, *see* Murphy Depo. at 39-40, told plaintiff that it would only take a minute and plaintiff, after asking for the fourth time what Murphy wanted while insisting how bad he felt, finally relented and stepped outside on the porch. Murphy told plaintiff he was there to give him a court date and for plaintiff to accompany him to the patrol car. Plaintiff told Murphy he was not going to go to the car. After refusing three or four times and starting to feel irritated, plaintiff finally gave up arguing with Murphy and went out to the car. Guest Depo. at 33-34.

Once at the car, Murphy got on the radio to request a court date for plaintiff. After what could have been five minutes (but, according to plaintiff, seemed to be thirty), plaintiff was given a court date. At that point plaintiff asked Murphy if they were done and began to turn to go back to the house at which point Murphy said, "No, we're not done." Guest Depo. at 34-35. Plaintiff states that he "really became frustrated and, you know, we exchanged words back and forth. He's sitting in the car with a hand on the door. You know, he started to shut it when I started to

---

[3] In his response to the City defendants' Statement of Undisputed Facts at ¶ 3, plaintiff summarily denies these events as asserted by the City defendants even though plaintiff specifically testified in his deposition that this is what happened.

leave but he stopped and didn't shut it all the way. The conversation was just getting worse and worse. It was just escalating." Guest Depo. at 35-36. Plaintiff then physically pushed the door of the patrol car shut – what he described as "assisting Officer Murphy in shutting his door" – allegedly denting the door, and turned to leave and walked toward the house. Guest Depo. at 37, 49; Pl.'s Resp. to City Def.s' St. of Undisp. Facts at ¶ 8. Plaintiff acknowledges that he was attempting to go in the house when Murphy told him not to and states that "[i]t's possible" he told Murphy to "f*** you and the horse you rode in on" as he was "very frustrated." Guest Depo. at 38. At that point, Murphy came up behind plaintiff and "slapped one handcuff on one hand." Guest Depo. at 49. Plaintiff states he was intentionally "pulled back down the step and landed face first in the dirt" with "a lot of force." Guest Depo. at 50-51. Plaintiff states that Murphy, who in his opinion was then being helpful, helped him up. Guest Depo. at 51. Plaintiff states that Murphy was looking at him scared as he was bleeding profusely from the mouth, plaintiff claiming the fall had broken the stitches loose. Guest Depo. at 52. Plaintiff asked Murphy, "What in the hell are you doing?," to which Murphy replied that he was arresting him. Guest Depo. at 52. At that point Murphy attempted to reach for plaintiff's hand that wasn't handcuffed but that whatever way he reached, plaintiff would "turn around from him. We like square danced around there for a while. He didn't hit me, trip me, kick me or nothing like that. We were still exchanging words. I was wanting to know what he was doing and why. He said he didn't have to tell me and he could arrest me." Guest Depo. at 53. Plaintiff, who as previously noted acknowledges that he refused Murphy's commands to put his hands behind his back to be handcuffed and that he attempted to go in the house when Murphy told him not to, made his way to a nearby vehicle and was holding on to a mirror while Murphy was trying to pull him away

4

from the mirror.  Guest Depo. at 53-56.  Plaintiff, not wanting to let go, broke the mirror off and both fell to the ground – what he described as a "tussle to the ground" – with plaintiff winding up on top of Murphy.  Guest Depo. at 54, 56-57.  At that point, Murphy called for backup as plaintiff continued to resist being handcuffed.  Guest Depo. at 56; Pl.'s Resp. to City Def.'s Undisp. Facts at ¶ 13.  Plaintiff and Murphy were still on the ground when the Craighead County Sheriff Deputies arrived.   Guest Depo. at 63.

Upon the arrival of the deputies, plaintiff, while on the ground with Murphy, stated he "kind of turned my head at an angle and I seen a guy's feet completely off the ground and knee was coming right for my head.  I ducked.  He hit me in the head anyway.  When I ducked and turned my head, he flew right over Officer Murphy.  He went – he must have went six, eight feet through the air."  Guest Depo. at 70.  Plaintiff states that Murphy must have had the breath knocked out of him the way he was gasping for air.  Plaintiff states he was kind of down on the ground and that when he started to sit back up, he "felt what I thought was someone's knees hit me in the back and slam me down on the ground."  Guest Depo. at 70.  Plaintiff states someone just started beating him on the back of the head.  Guest Depo. at 71.  He states that someone was on his back and that he told them it "was killing me" and that he couldn't breathe.  Guest Depo. at 71.  Plaintiff states they told him to give them his arm and that he tried to tell them, "I can't get it out from under me.  You're smashing me" and, "I think you're killing me, man."  Guest Depo. at 71.  Plaintiff states that about that time, he saw some feet come up to his right side and "somebody just started kicking the crap out of my ribs."  Guest Depo. at 71.  Plaintiff states that he believes there were more than one set of knees on his back and that he thinks he at that point lost consciousness from a lack of breath.  Guest Depo. at 72.  The next thing plaintiff states he

5

remembers is being up on his knees and the back of his hand was on the middle of his rib cage in the spine in the center of his back when his arm goes straight up in the air behind him "[a]nd it snaps very loudly as the police officer says, "I'll show you how to put your hands behind you." Guest Depo. at 72. Subsequently, one of the deputies transported plaintiff to the hospital. Plaintiff was arrested for disorderly conduct, resisting arrest, and damage to public property (a dent to the door of Murphy's patrol car allegedly incurred when plaintiff "assisted" Murphy in closing the door).

Hospital records revealed that plaintiff had a dislocated right elbow, a cracked rib, and a tiny pneumothorax (collapsed lung). Plaintiff was unable to specifically identify which of the deputies inflicted the injuries upon him. Plaintiff does not attribute these injuries to directly to Murphy, claiming only that Murphy "set off the chain of events that directly led to [his] injuries, even if some of [his] more serious injuries were caused by the County Deputies." Pl.'s Resp. to City Def.'s Undisp. Facts at ¶ 16. Although plaintiff claims Murphy's throwing him to the ground caused him to bleed from the mouth, even though he acknowledges he was already bleeding from the mouth when Murphy arrived at the residence, no mention was made in the hospital records of any mouth injury, such as busted stitches, and plaintiff does not point to any dental records that might indicate such an injury.[4]

---

[4] In addition to bleeding from his mouth, plaintiff also claims, citing the deposition of his son, Matthew Guest, that Murphy's throwing him to the ground caused him to bleed from his face. Pl.'s Resp. to City Def.'s Undisp. Facts at ¶ 16. The deposition of Matthew Guest as submitted by plaintiff does not make such a reference, however, and the hospital records make no reference to any kind of facial injury. The only reference to the condition of plaintiff's face (other than his mouth) of which this Court is aware is from plaintiff's sister, Kathy Smith, who said that blood was running out of plaintiff's mouth and nose.

II.

The City defendants move for summary judgment on grounds that (1) Murphy did not use excessive force on plaintiff; (2) there was probable cause to arrest plaintiff; (3) there was no unreasonable seizure; (4) Murphy had no duty to protect plaintiff under the circumstances; (5) Murphy is entitled to qualified immunity; (6) there is no municipal liability; and (7) plaintiff's state-law claims of assault and battery are barred by the one-year statute of limitations for such claims under Arkansas law. The County defendants, in turn, move for summary judgment on grounds that (1) plaintiff was not subjected to excessive force by the County defendants; (2) the County defendants did not arrest plaintiff for purposes of plaintiff's unreasonable seizure and unlawful arrest claims – Officer Murphy did – and even if they did, there was probable cause to do so; (3) County defendants had no duty to protect plaintiff from Officer Murphy; (4) there is no negligence liability; (5) plaintiff's assault and battery claims are time-barred; (6) there is no municipal liability on the part of Craighead County; (7) County defendants are entitled to qualified immunity; and (8) plaintiff can offer no proof of compensatory or punitive damages. All defendants argue that there are no genuine issues of material fact with respect to any of these issues and that they are entitled to summary judgment as a matter of law.

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party

7

must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted).

B.

As an initial matter, the Court notes that plaintiff does not address in his response to the City and County defendants' motions for summary judgment their arguments that they are entitled to summary judgment on plaintiff's failure to protect and negligence liability claims (he has thus created no issue of material fact on these claims in the face of defendants' properly supported motions for summary judgment) and he acknowledges that his assault and battery claims are time-barred. Summary judgment therefore is granted on all these claims as to both the City and County defendants. The Court now turns to the remainder of the issues presented by defendants' motions for summary judgment beginning first with the City defendants' motion for

8

summary judgment on plaintiff excessive force claim.

1.

a.

Plaintiff's excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Kuha v. City of Minnetonka*, 365 F.3d 590, 597 (8th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. *Id.* (citations omitted). However, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* An officer's evil intent will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *Id.* In addition to the circumstances surrounding the use of force, this Court may also consider the result of the force.

*Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) (citations omitted).

The Court has carefully considered the record and determines that plaintiff has not presented enough proof in support of his claim of excessive force against Murphy that a jury could properly find that the degree of force used against him was not "objectively reasonable." Plaintiff, by his own admission, was disobeying Murphy's instructions not to go into the house and states that "[i]t's possible" he told Murphy to "f*** you and the horse you rode in on" when Murphy thereupon came up behind plaintiff and "slapped one handcuff on one hand." Plaintiff states he was intentionally "pulled back down the step and landed face first in the dirt" with "a lot of force" but, despite bleeding from the mouth (which was occurring before Murphy even arrived due to having sixteen teeth extracted that day), he does not present evidence of injury that would even remotely suggest force on the part of Murphy that was not objectively reasonable under the circumstances.[5] Indeed, plaintiff states that Murphy was being helpful when he helped him up and he acknowledges that Murphy did not hit him, trip him, kick him "or nothing like that." Murphy's physical interaction with plaintiff and the results of that interaction (prior to the arrival of the County defendants) simply in no way evidences an objectively unreasonable use of force and the Court therefore grants the City defendants' motion for summary judgment on plaintiff's excessive force claim.[6]

---

[5] Plaintiff acknowledges he only received treatment for a dislocated elbow and broken rib, injuries that were not sustained during his encounter with Murphy, and that he was later diagnosed as having a punctured lung, again an injury that is not attributable to Murphy. *See* Pl.'s Resp. to County Def.s' Mot. for Summ. J. at 5.

[6] For these reasons, Murphy would be entitled to qualified immunity on plaintiff's claim of excessive force as, even taken in the light most favorable to plaintiff, the facts alleged do not show that Murphy's conduct violated a constitutional right . *See Littrell*, 388 F.3d at 582.

b.

The Court likewise grants the City's motion for summary judgment on plaintiff's unreasonable seizure and unlawful arrest claims. Quite simply, and without repeating all that is set forth above, plaintiff, by his own admission, was combative with Murphy, was disobeying Murphy's lawful command not to go into the house, and then physically resisted being handcuffed. Clearly there was probable cause to restrain and arrest plaintiff under these circumstances for, among other things, disorderly conduct, and Murphy did not act unreasonably in doing so. *See McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908 (8th Cir. 2005) (a seizure for Fourth Amendment purposes occurs when a government actor by means of physical force or show of authority in some way restrains the liberty of a citizen); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (noting that the Fourth Amendment is not violated by a warrantless arrest if "an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence"). *See also Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993) (noting that in determining whether an officer had reasonable grounds to believe that a person has committed, is committing, or is about to commit an offense, the facts known to him need not meet the standard of conclusiveness upon which a conviction must be based, but, rather, the actions of the officer in making an arrest are to be measured by the test of what a reasonable person would have believed under the same circumstances).[7]

---

[7] For these reasons, Murphy would be entitled to qualified immunity on plaintiff's claims of unreasonable seizure and unlawful arrest as, even taken in the light most favorable to plaintiff, the facts alleged do not show that Murphy's conduct violated plaintiff's constitutional right to be free from an unreasonable seizure and unlawful arrest. *See Littrell*, 388 F.3d at 582.

c.

Finally, because Murphy's actions with respect to plaintiff did not violate plaintiff's constitutional rights, plaintiff's claims against the City likewise fail. *See, e.g., McVay*, 399 F.3d at 909 (stating "[s]ince we have found that [the officer's] actions were not unconstitutional, McVay cannot make a prima facie case against the City under section 1983"); *Veneklase v. City of Fargo*, 248 F.3d 738, 748 (8th Cir.) (en banc) (declaring "where arresting police officers are absolved of liability to arrestees, the City ordinarily is not liable"), *cert. denied*, 534 U.S. 815 (2001); *Thomas v. Dickel*, 213 F.3d 1023, 1026 (8th Cir.) (reasoning that because the officers' stop of the plaintiffs' car did not violate their Fourth Amendment rights, it follows that plaintiffs' claim against the City – inadequate training and municipal custom – must likewise fail), *cert. denied*, 531 U.S. 1013 (2000); *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) (holding that city cannot be found liable on either a failure-to-train theory or a municipal custom/policy theory unless a defendant police officer is found liable on an underlying substantive claim).

2.

a.

Turning to the County defendants' motion for summary judgment, the Court first grants the County defendants' motion for summary judgment on plaintiff's claim that he was subjected to an unreasonable seizure and unlawful arrest. Even if it was the deputies who arrested plaintiff, it is undisputed that when the deputies arrived on the scene, plaintiff and Murphy were on the ground, either side-by-side or with Murphy on top of plaintiff (claims plaintiff), as Murphy was

attempting to handcuff plaintiff. Plaintiff claims he was non-threatening at this point, but this Court has no hesitation in concluding that the deputies had probable cause to secure the scene and restrain and/or arrest plaintiff and that their determination to do so was reasonable under the circumstances. *See McVay*, 399 F.3d at 908; *Atwater*, 532 U.S. at 354; *Arnott*, 995 F.2d at 124.[8]

b.

The Court now turns to plaintiff's excessive force claim against County defendants in their individual capacities, which involves only deputies Bassham, Johnson, and Richardson.[9] As previously noted, plaintiff's excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Kuha*, 365 F.3d 590, 597 (8th Cir. 2003) (citing *Graham*, 490 U.S. at 395). To repeat, the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular

---

[8] For these reasons, the deputies would be entitled to qualified immunity on plaintiff's claims of unreasonable seizure and unlawful arrest as, even taken in the light most favorable to plaintiff, the facts alleged do not show that the deputies violated plaintiff's constitutional right to be free from an unreasonable seizure and unlawful arrest. *See Littrell*, 388 F.3d at 582.

[9] Of the County defendants, only deputies Bassham, Johnson, and Richardson are sued in their individual as well as official capacities; Jack McCann, Sheriff of Craighead County, is sued only in his official capacity.

13

situation. *Id.* The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* In addition to the circumstances surrounding the use of force, this Court may also consider the result of the force. *Littrell*, 388 F.3d at 583.

The Court has carefully considered the matter and determines that there remain genuine issues of material fact with respect to whether excessive force on the part of deputies Bassham, Johnson and Richardson was used against plaintiff. As stated above, plaintiff, among other things, alleges that during the course of his encounter with the deputies, he was slammed to the ground, beaten in the head, somebody was "kicking the crap" out of his ribs, that there was at least one set of knees on his back impairing his breathing, and that when he was up on his knees, his arm goes straight up in the air behind him "[a]nd it snaps very loudly as the police officer says, 'I'll show you how to put your hands behind you.'" Plaintiff's sister, Kathy Smith, testified that plaintiff looked "like he had been beat pretty good," while his son, Matthew Guest, testified that at least one deputy hit plaintiff in the side of his face with his knee. Hospital records revealed that plaintiff had a dislocated right elbow, a cracked rib, and a tiny pneumothorax (collapsed lung). "The question for the jury is whether, judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of the force used," *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990), and given plaintiff's allegations and the injuries he suffered, this Court determines that the evidence is sufficient to create a jury question as to whether the force used by the deputies to restrain plaintiff was excessive. *Cf. Littrell*, 388 F.3d 578 (issue of excessive force properly submitted to the jury where arrestee suffered a deep laceration on her forehead and a broken arm due to a

"straight arm bar takedown" in the course of her apprehension for drunk driving).

c.

There remains the issue of whether the deputies are entitled to qualified immunity for their alleged excessive force. *See, e.g., Bankhead v. Knickrehm*, 360 F.3d 839, 844 (8th Cir.) (qualified immunity is a defense only against a claim in one's individual liability), *cert. denied*, 125 S.Ct. 57 (2004). Qualified immunity shields government officials such as deputies Bassham, Johnson, and Richardson from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known. *Littrell*, 388 F.3d at 582 (citing *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "'[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Id.* (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993)).

Courts employ a two-part inquiry to determine whether a lawsuit against a public official can proceed in the face of the official's assertion of qualified immunity. *Id.* (citations omitted). First, courts must consider whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. *Id.* Second, courts must ask whether the right was clearly established. *Id.* For a right to be deemed clearly

established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.*

The issue of qualified immunity is frequently intertwined with unresolved factual issues, *see id.*, and such is the case here. In this respect, this Court simply is unable to grant qualified immunity to the deputies at this time as the unresolved factual issues stated previously prevent this Court from conclusively ruling on the issue. Accordingly, the Court will deny without prejudice qualified immunity to the deputies at this time. At trial, the Court will tailor special interrogatories specific to the facts of this case which will allow the jury to make requisite factual findings (*i.e.*, whether the underlying facts are as the plaintiff has alleged or proved) that this Court may then rely upon to revisit the qualified immunity determination. *See Littrell*, 388 F.3d at 585.

d.

With respect to plaintiff's municipal liability claim, the County defendants argue that under the United States Supreme Court's decision in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. In considering this argument, the Court will treat plaintiff's suit against the County defendants in their official capacities as a suit against Craighead County. *See Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 904-05 (8th Cir. 1999) (official-capacity claims against police board members must be treated as claims brought against municipality), *cert. denied*, 528 U.S. 1157 (2000); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 800 (8th Cir. 1998) (liability for city officials in their official capacities is another form of action against the

city, and it requires the same showing that a policy or custom caused the alleged violation).

A plaintiff may establish municipal liability under § 1983 by proving that his constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell*, 436 U.S. at 691). "Official policy involves 'a deliberate choice to follow a course of action * * * made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." *Id*. (quoting *Jane Doe A v. Special Sch. Dist.,* 901 F.2d 642, 645 (8th Cir. 1990)). Alternatively, "custom or usage" is demonstrated by: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.*, proof that the custom was the moving force behind the constitutional violation. *Id*. (quoting *Jane Doe A,* 901 F.2d at 646).

Plaintiff argues that the County defendants all acted according to policies of Craighead County Sheriff's Department and that "the direct cause of the injuries is not the aberrant acts of rogue police officers (for which a municipality may not be liable), but the execution of the Craighead County's policies." Pl.'s Resp. to County Def.s' Mot. for Summ. J. at 23. Thus, plaintiff does not appear to be arguing that his injuries resulted from misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage'

17

with the force of law," but that his constitutional rights were violated by an "action pursuant to official municipal policy." *Ware*, 150 F.3d at 880.

A "policy," as previously noted, is a "'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Hayes v. Faulkner County, Ark.*, 388 F.3d 669, 674 (8th Cir. 2004) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986)). *See also Kuha*, 365 F.3d at 603 (a city may be sued under § 1983 where "'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's] officers'") (quoting *Monell*, 436 U.S. at 690)). Here, however, plaintiff has not presented any evidence whatsoever of any type of policy, ordinance, regulation or decision, whether written or otherwise, in support of his argument that the County defendants all acted according to policies of Craighead County Sheriff's Department and that the direct cause of his injuries was the execution of the Craighead County's policies; the record simply is devoid of such evidence. Plaintiff thus has not established that the alleged unconstitutional acts of the deputies was part of an official policy of Craighead County. *Cf. Veneklase*, 248 F.3d at 748 (no evidence existed in the record that City followed a custom of having its police offices arrest picketers who were not in violation of the law).

Even assuming plaintiff is arguing misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law," plaintiff has not in any way demonstrated (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2)

deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.*, proof that the custom was the moving force behind the constitutional violation. *Ware*, 150 F.3d at 880. In this respect, plaintiff, among other deficiencies, does not even allege one other instance of misconduct of the kinds alleged in the complaint, whether it be unreasonable seizure and unlawful arrest or excessive force. *Cf. Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (noting that "two specific prior complaints ... and the various rumors that do not implicate a particular officer pale in comparison to the type of prior complaints" that have been held to constitute a persistent and widespread pattern of misconduct).

Accordingly, whether plaintiff's argument is that his constitutional rights were violated by an action pursuant to official municipal policy, or that his injuries resulted from misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law, the Court grants summary judgment in favor of the County defendants in their official capacities on plaintiff's municipal liability claim.

e.

Finally, the Court denies without prejudice County defendants' motion for summary judgment on the issues of compensatory and punitive damages. These issues will be addressed at the time of trial.

19

III.

For the foregoing reasons, the Court finds that the City defendants' motion for summary judgment should be and hereby is granted in its entirety, and that the County defendants' motion for summary judgment should be and hereby is granted in part and denied in part. This action will proceed against Craighead County Sheriff Deputies Jared Bassham, Ron Richardson, and Leon Johnson in their individual capacities only and solely on plaintiff's claim of excessive force. As set forth above, the Court will deny without prejudice qualified immunity to these defendants on plaintiff's excessive force claim at this time.

IT IS SO ORDERED this 18 day of July, 2005.

/s/Susan Webber Wright

CHIEF JUDGE
UNITED STATES DISTRICT COURT